UNITED STATES of America

v.

Orlando CAICEDO–LLANOS, Appellant.

No. 90–3165.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 3, 1991.

Decided March 31, 1992.

Rehearing Denied May 8, 1992.

Thomas G. Corcoran, Jr., Washington, D.C. (appointed by the Court) for appellant.

Kathleen O'Connor, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Roy W. McLeese, III, Asst. U.S. Attys., were on the brief, for appellee.

Before MIKVA, Chief Judge; SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Orlando Caicedo–Llanos appeals his conviction for possession of over 500 grams of cocaine with intent to distribute. He argues that the government's failure to preserve and produce certain photographic evidence violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and his discovery rights under Rule 16 of the Federal Rules of Criminal Procedure. For reasons detailed below, we reject both arguments and affirm.

I. BACKGROUND

*A. Facts*

Consistent with the findings of the District Court, the facts of this case are as follows. The New York City Police Department (NYPD) telephoned Detective Dade of the Metropolitan Police Department's Fugitive Squad on January 16, 1990, seeking assistance in apprehending two suspects wanted in connection with a double shooting.[1] The NYPD informed Detective Dade that both suspects were male, black, and Panamanian. It also informed him that the two were travelling together on a bus scheduled to arrive in Washington, D.C., later that day. The NYPD provided Dade with the arrival time, the gate, and the number of the bus. It also offered him the name and a description of one suspect, and the name and illegal alien status of the other. In addition to the

information provided by telephone, the NYPD faxed Dade a photograph of one suspect. Based on the telephoned and faxed information, officers of the Metropolitan Police Department obtained the assistance of Immigration and Naturalization Service (INS) Special Agent Crispino, and arrived at the bus station ahead of the bus described by the NYPD.

As Dade and Sergeant Getz, also of the Metropolitan Police Department, watched passengers disembark from the bus, they noticed a man who, in their opinion, matched the description of the subject mentioned in the telephone call and pictured in the faxed photograph. This individual was later identified as Mr. Palamino–Perez (the "codefendant"). Sergeant Getz approached and asked the codefendant questions, but could not communicate with him: Palamino–Perez speaks only Spanish. At this point, INS Agent Crispino approached, showed his badge, and, speaking in Spanish, asked Palamino–Perez his name, place of birth, and whether he had any identification or immigration papers with him. Palamino–Perez responded that he was born in Colombia, lived presently in New York, and had no form of identification or immigration papers. Palamino–Perez was arrested for violating immigration laws and then searched. Getz found two kilo bricks of cocaine in a girdle strapped to the codefendant's body.

Simultaneous with the questioning of Palamino–Perez, Officer Fant, another Metropolitan Police officer, boarded the bus and noticed another individual he thought fit the description of the wanted suspects. This individual, Mr. Caicedo–Llanos (the "appellant") was apparently fumbling with something under his seat. A woman on the bus told Fant that Caicedo–Llanos "put it under his seat." Fant then apparently got off the bus to speak with the bus driver; the driver told him that the codefendant and appellant had travelled together. At this point, Fant also learned of the

---

1. In proceedings before the District Court and its brief to this Court, the government represented the incident for which the two suspects were wanted as a "double homicide." Only at oral argument before this Court did the government

state for the first time that the incident was a "double shooting" which may or may not have resulted in death. We should hope that the government might become more careful in its representations.

codefendant's arrest and of the cocaine recovered from his girdle. Gun drawn, Fant reboarded the bus, conducted a pat-down of Caicedo–Llanos, and led him off the bus. Crispino then questioned appellant about his immigration status and learned that he too was born in Colombia and had no immigration papers. Crispino arrested Caicedo–Llanos for violating immigration laws and then conducted a search. Crispino found two kilos of cocaine strapped to Caicedo–Llanos' body. Police also recovered the package under Caicedo–Llanos' bus seat at this time and found it filled with cocaine. The apparent street value of the drugs recovered from appellant and codefendant was $806,040.

Following the arrests, all copies of the photograph faxed from the NYPD were lost or discarded. Dade testified at a suppression hearing that he could not recall who at the NYPD sent the fax to him, or in which New York office the sender worked. A copy of the fax sat on Dade's desk for several months, but he discarded it one week before the prosecutor contacted him about the case. Dade is a twenty-year veteran of the Metropolitan Police.[2]

At trial, varying descriptions of the faxed photograph were elicited from the various officers involved in appellant's arrest. Officers disagreed as to whether the picture depicted one or two men, and whether the man (or men) depicted wore facial hair or a long haircut. Defense produced the bus driver, Mr. Walter Clay, who testified that police had shown him the faxed photograph and that he told them he had seen no resemblance between the picture and either the appellant or codefendant. Clay did, however, acknowledge that Palamino–Perez and Caicedo–Llanos had boarded the bus and travelled together.

The government conceded at trial that appellant is not one of the New York shooting suspects. Defense counsel apparently acknowledged that appellant is an illegal alien, that he is a black Hispanic male, and that he was travelling with Palamino–Perez.

## B. Hearing Before the District Court

### 1. Appellant's Position

Appellant and codefendant argued in the District Court that, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government violated their due process rights by failing to preserve and produce the faxed photograph. As is familiar learning, *Brady* established the principle that a defendant has a due process right to request and receive evidence in the government's possession that is material to his guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Id.* at 86–88, 83 S.Ct. at 1196–1198.

Appellant and codefendant argued that the proper remedy for the photograph's loss was suppression of all evidence recovered in both arrests. Such a suppression, they continued, would of course necessitate a dismissal of the charges against them.

### 2. The District Court's Ruling

The District Court ruled that the due process issue in this case should not be analyzed under *Brady,* but under *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood,* the Supreme Court held that when considering evidence lost by the government, "of which no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant," a defendant must show that the government acted in bad faith in order to demonstrate a due process violation. *Id.* at 57–58, 109 S.Ct. at 337–338.

Applying *Youngblood,* the trial court concluded that the police had not acted in bad faith. It also noted that the photographic evidence was immaterial to appellant's defense because the police could have properly arrested and searched appellant, even if the photograph had been available and looked nothing like codefendant: first, Officer Fant had probable cause to arrest appellant based on his belief that Caicedo–Llanos was one of the two fugitives travelling together and his knowledge

---

2. We should hope that a Metropolitan Police veteran of twenty years would be trained to retain information such as the faxed photograph and the name of his New York contact.

that drugs had been recovered from the codefendant; second, Fant had sufficient articulable suspicion to stop appellant to investigate whether he was one of the two fugitives and, after appellant was taken off the bus, the INS Agent had probable cause to arrest him for immigration violations.

Appellant now contends on appeal that the District Court erred in applying *Youngblood* rather than *Brady* and that, under either standard, a due process violation occurred which requires the suppression of all seized evidence. He also alleges that the government violated his discovery rights under Fed.R.Crim.P. 16.

## II. ANALYSIS

### A. Due Process Concerns

#### 1. Appellant's Argument

Appellant contends that the District Court erred in applying *Youngblood* rather than *Brady* to the facts of this case. *Youngblood* is inapplicable, he argues, because the faxed photograph is not evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57, 109 S.Ct. at 337. While the untested semen samples in *Youngblood* clearly required scientific analysis to prove their usefulness, the value of a photograph, Caicedo–Llanos claims, is self-evident. We note that the consequences of applying a *Youngblood* rather than a *Brady* analysis can be quite serious: under *Youngblood* defendant bears the burden of showing that the police acted in bad faith in destroying the evidence; under *Brady* he does not.

#### 2. The Materiality Requirement and the Personal Nature of the Fourth Amendment Guarantee

While the question of which due process standard should apply to the facts before us raises interesting constitutional issues, it is one we need not resolve today. Under either *Youngblood* or *Brady*, appellant is obliged to demonstrate that the evidence he seeks is in some fashion material to his defense. *See Brady*, 373 U.S. at 87, 83 S.Ct. at 1197 (to implicate due process,

evidence must be "material to either guilt or punishment"); *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (*Brady*'s materiality requirement forces defendant to show that there "is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."); *Youngblood*, 488 U.S. at 57, 109 S.Ct. at 337 (lost evidence must at least be amenable to tests that might exonerate defendant). Appellant, however, is unable to show that the evidence he seeks satisfies any of these standards: in fact, his argument for the photograph's materiality merely underscores its irrelevance.

Appellant's materiality argument follows this course:

> Fant [arrested Llanos] when he was told that Llanos had gotten on the bus with Perez, who had been stopped and searched assertedly because of his resemblance to the missing FAX. It is thus clear that Llanos' arrest flowed, in fact, from the arrest of Perez, which was legal only if Perez resembled the FAX.

Appellant's Initial Brief at 16. According to appellant, then, the photograph is material to his defense only because of its value in challenging the validity of his codefendant's arrest, from which his own search "flowed."

The problem with appellant's syllogism lies not in its chain of inference and argument, but in its fundamental assumption. At bottom, it rests on the proposition that appellant may argue for the suppression of evidence recovered in another person's search. More plainly: it assumes that appellant may assert the Fourth Amendment rights of his codefendant. Without this assumption as analytical bulwark, appellant's entire materiality syllogism must fall.

■ Our Fourth Amendment jurisprudence is very clear in its rejection of appellant's fundamental assumption: it does not countenance the assertion of another's

right to be free from unreasonable searches and seizures. Fourth Amendment rights are emphatically "personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176 (1969). A defendant's "constitutional rights are violated 'only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party.'" *United States v. Burnett*, 890 F.2d 1233, 1236 (D.C.Cir.1989) (quoting *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980)). Consequently, the suppression of illegally seized evidence "can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman*, 394 U.S. at 171–72, 89 S.Ct. at 965–66. This principle is as well-established as it is wise. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Brown v. United States*, 411 U.S. 223, 230, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973); *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 973, 19 L.Ed.2d 1247 (1968); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *cf. Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961); *Gouled v. United States*, 255 U.S. 298, 304, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921).

■ If appellant could show that the photograph was used as the basis for his own arrest, we might have a substantially different case before us. But, as the facts show, and appellant concedes, the photograph is material only to determining the validity of another person's arrest, not his own. Consequently, it is completely irrelevant to his defense.

■ Appellant resists this conclusion with three points. First, because the government did not challenge his capacity to assert the codefendant's Fourth Amendment rights before the District Court, appellant argues that it is precluded from doing so on appeal. He is correct to point out that "an appellate court does not give consideration to issues not raised below," as litigants ought not to be "surprised on appeal by final decision there of issues upon which they ha[d] no opportunity to introduce evidence." *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). But, appellant fails to note that the rule is not absolute: "There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court ... below." *Id.* at 557, 61 S.Ct. at 721.

■ An inescapably "particular circumstance" exists here. The personal nature of the Fourth Amendment guarantee is a substantive limit on the rights of the individual: we are powerless to rule on Fourth Amendment rights which do not belong to the parties before us. Further, appellant cannot convincingly complain that he is the unfortunate litigant for whom the rule against sandbagging was designed. *Hormel*, 312 U.S. at 556, 61 S.Ct. at 721. To the contrary, appellant carries the burden of proving the extent of his Fourth Amendment rights from the outset. *Rakas* made this crystal clear: "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1. Thus, the failure to raise the issue before the District Court was appellant's own.

We note that the First Circuit has faced this issue and decided it as we do. *United States v. Miller*, 636 F.2d 850, 853–54 (1st Cir.1980). While the Tenth Circuit originally disagreed with this analysis, *United States v. Ford*, 525 F.2d 1308, 1310 (10th Cir.1975), it appears to have abandoned its position in favor of the First Circuit's. *United States v. Hansen*, 652 F.2d 1374, 1381–82 (10th Cir.1981).

Finally, we acknowledge that on one occasion the Supreme Court did preclude argument about the scope of a defendant's Fourth Amendment rights because the issue had not been raised below. *See Steag-*

*ald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). However, the holding in that case does not purport to cover the situation before us. In *Steagald* the government had affirmatively asserted in the trial court, the court of appeals, and its petition for certiorari that defendant did have a legitimate expectation of privacy cognizable under the Fourth Amendment. *Id.* at 208, 101 S.Ct. at 1646. Only in its full brief to the Court did the government finally switch course, asking the Court to rule that defendant could claim no Fourth Amendment protection.

■ At no point in the case before us has the government affirmatively represented that Caicedo–Llanos may raise a Fourth Amendment claim to Palamino–Perez's person. At best, it can be said to have acquiesced in appellant's own assertion that he had a cognizable interest in the codefendant's arrest. We decline to hold that mere acquiescence is enough to preclude the government from raising Fourth Amendment concerns for the first time on appeal. Our position is in harmony with the Tenth Circuit's treatment of this issue. *See Hansen*, 652 F.2d at 1382–83.

Second, appellant claims that, at the very least, this Court should remand this case to the District Court for further proceedings to explore his rights in codefendant's person. In *Combs v. United States*, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972), the Court did remand for further proceedings on a newly raised Fourth Amendment issue. But, *Combs* is clearly and appropriately distinguishable from the situation before us. In *Combs* the Court found the record "virtually barren of the facts necessary to determine" appellant's right to contest the search and seizure. *Id.* at 227, 92 S.Ct. at 2286. In the case before us, appellant has not—and cannot—suggest that the record before us is in any way factually deficient.

Further, the issue before the Court in *Combs* involved appellant's expectation of privacy in a particular geographic location—a question of fact and, thus, properly the domain of the trial court. Here, however, the question before us is not appellant's expectation of privacy in a certain location, but in another person—an issue of law, not fact—and thus, one amenable to our scrutiny. We note that the Tenth Circuit has also distinguished *Combs* along the lines we do. *See Hansen*, 652 F.2d at 1383.

Appellant's final objection rests on a single case from the Eastern District of New York which, he argues, established that he may assert his codefendant's Fourth Amendment rights. In *United States v. Westerbann–Martinez*, 435 F.Supp. 690 (E.D.N.Y.1977), defendant was permitted to challenge the search of his codefendant's suitcase because the crime for which he was charged was aiding and abetting the codefendant in the possession of drugs found within the bag. Though a District Court decision obviously is not controlling precedent, we pause to note that the case is readily distinguishable in any event. Unlike the *Westerbann–Martinez* defendant, Caicedo–Llanos was not convicted of a crime stemming from items found in another person's property; rather, he was convicted on the basis of drugs found on his own person.

We also note that *Westerbann–Martinez* is probably not the law even in the circuit where it was decided, *see United States v. Riquelmy*, 572 F.2d 947 (2d Cir.1978), and that it was decided before *Rakas*.

### 3. Other Materiality Issues

There may be materiality problems lurking in appellant's claim to the faxed photograph beyond the Fourth Amendment difficulty we have identified. As mentioned above, the trial court assumed that *even if* appellant had a legitimate expectation of privacy in his codefendant's person and *even if* that expectation were impermissibly violated, there were *still* alternative bases for finding the faxed photograph immaterial for due process purposes. We think it unnecessary to reach these additional materiality arguments, however, having demonstrated that the only use to which appellant

might put the photograph is plainly impermissible.[3]

### B. The Rule 16 Argument

█ Appellant claims that, even if the photograph's loss does not implicate his due process rights, it does violate his discovery rights. Under Fed.R.Crim.P. 16(a)(1)(C), a defendant may, on request, compel disclosure of information "material to the preparation of [his] defense." Appellant, however, failed to include this argument in his initial brief; instead, he relegated it to two paragraphs in his reply brief.

This Court will not ordinarily entertain arguments inadequately briefed on appeal. *See Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983). Consequently, we generally will not indulge arguments raised for the first time in an appellant's reply brief. *See Golden Pacific Bancorp v. Clarke,* 837 F.2d 509, 513 (D.C.Cir.1988); *McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 800 F.2d 1208, 1211 (D.C.Cir.1986); *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 284 n. 32 (D.C.Cir.1981); *United States v. Haldeman,* 559 F.2d 31, 78 n. 113 (D.C.Cir.1976) (en banc) (per curiam), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *see also* Fed. R.App.P. 28(a)(4). We have explained the importance of our rule in *McBride:* "Considering an argument advanced for the first time in a reply brief ... is not only

unfair to the appellee but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." 800 F.2d at 1211. We do not sit, after all, as "self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before" us. *Carducci,* 714 F.2d at 177.

Finding no extraordinary reason to avoid the application of our general rule, we decline to consider appellant's Rule 16 claim.[4]

### III. CONCLUSION

Appellant must show that the evidence he seeks is, in one fashion or another, material to his defense. Because his only theory on the materiality of the faxed photograph falters in assuming that he may assert another's Fourth Amendment rights, appellant's conviction is

*Affirmed.*

---

3. We do note that even if appellant could overcome his Fourth Amendment difficulties, the faxed photograph would *still* be immaterial for Fifth Amendment due process purposes. The trial court found that Caicedo–Llanos' arrest could be sustained without any reference to the missing fax on three alternative grounds: (1) a stop pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); (2) an arrest based on probable cause due to the discovery of contraband; and (3) a proper immigration arrest. We would agree with the District Court that Caicedo–Llanos' arrest could be sustained at least under the third theory. *Cf. Cheung Tin Wong v. United States Immigration & Naturalization Service,* 468 F.2d 1123 (D.C.Cir.1972) (INS agent justified in conducting brief stop of suspicious individual based on agent's belief that individual was illegal alien).

4. We do note that even if we were to consider the Rule 16 argument, it is not a compelling one. While the materiality requirement in the discovery rules may differ slightly from the materiality requirement in the due process scenario, it still requires a showing that

> the evidence in question bears some abstract logical relationship to the issues in the case.... There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.

*United States v. Ross,* 511 F.2d 757, 762–63 (5th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

For reasons discussed above in the due process context, the faxed photograph could not meet this standard.